TIMOTHY COURCHAINE
United States Attorney
District of Arizona

LEIGHANN M. THOMAS
Assistant U.S. Attorney
Illinois State Bar No. 6327687
Two Renaissance Square
40 N. Central Ave., Ste. 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: LeighAnn.Thomas@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>              Plaintiff,<br><br>    v.<br><br> Blademir Angulo Audeves,<br><br>              Defendant. | CR-25-01029-PHX-DJH<br><br>**UNITED STATES' RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM** |

The United States of America, by and through undersigned counsel, respectfully responds to Defendant's Sentencing Memorandum (Doc. 30) and requests that the Court sentence defendant to 18 months' imprisonment on Count 1 and 6 months on Count 4, to run concurrently, followed by 3 years of supervised release.

I.    **PROCEDURAL HISTORY**

On July 10, 2025, Defendant was charged by criminal complaint with Possession of a Firearm by an Alien Unlawfully Present in the United States, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(8) (Count 1), Harboring Illegal Aliens, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and (a)(1)(B)(ii) (Count 2), Improper Entry by Alien, in violation of 8 U.S.C. § 1325(a)(1) (Count 3), and Pattern and Practice of Knowingly Employing Unauthorized Aliens, in violation of 8 U.S.C. § 1324a(a)(1), (a)(2), and (f)(1) (Count 4) (Doc. 1).  On July 15, 2025, a grand jury returned a four-count indictment for the same charges with a forfeiture allegation (Doc. 11).  On August 20, 2025, Defendant pleaded

guilty to Counts 1 and 4 of the indictment pursuant to a written plea agreement (Doc. 23). Defendant is set for sentencing before Your Honor on October 28, 2025. (Doc. 22). Defendant has been in pretrial custody since his arrest on July 8, 2025, and has 112 days detention credit.

## II.    FACTS

In March 2025, Homeland Security Investigations agents began conducting an investigation into Defendant, an illegal alien, and his business, Taqueria El Taco Loko LLC, due to suspected employment of unlawfully present aliens without employment authorization. Defendant's business operated a brick-and-mortar restaurant located in Phoenix, and mobile restaurants including a Taco Bus and Taco Trailer[1] in Laveen and Maricopa, Arizona. (PSR ¶ 5). A Cargo Van was also used to conduct Defendant's business.

In 2011, Defendant was encountered at the West Valley Detention Center in San Bernardino County, California, where he admitted to being illegally present in the United States. (PSR ¶ 6). In 2018, he was granted a voluntary departure, and after court proceedings, appeals, and breached bonds, on May 26, 2021, Defendant voluntarily returned to Mexico. *Id.* There was no record of him legally reentering the United States after his departure, and, therefore, he was illegally present in the United States. *Id.* Defendant admitted that he illegally entered the United States from Mexico by walking through the desert in August 2021. (PSR ¶ 14).

During surveillance, agents positively identified at least 12 illegal aliens determined to be citizens of Mexico actively working for the business, including at least three of who had previously been removed from the United States to Mexico. (PSR ¶ 7). Agents determined the 12 illegal aliens were not authorized to lawfully work in the United States. Defendant too was determined to be an illegal alien without authorization to lawfully work in the United States. (PSR ¶ 6). Some of these aliens, including Jesus Antonio Camacho

---

[1]    Defendant has agreed to the forfeiture of this property in the plea agreement.

Verdugo and Joel Daniel Vega Anaya, were also observed residing on Defendant's property in a manner consistent with residing in recreational vehicles or trailers parked on his property. (PSR ¶ 7).

On July 8, 2025, federal search warrants were executed at Defendant's residence, the brick-and-mortar restaurant, the Taco Bus, the Taco Trailer, and a second residence located on 16th Avenue. (PSR ¶ 9). During a search of Defendant's residence, three firearms and ammunition were located inside the master bedroom in a closet. *Id.* These firearms were: a Mossberg .22LR Rifle, Serial Number EM13907346 ("Rifle"); a Colt 1911 Government Model 45 ACP, Serial Number FG65072 ("Colt 1911"); and a Colt Single Action Army 45, Serial Number P70363 ("Colt Single Action"). *Id.* All three firearms were determined to have travelled in interstate commerce as the items were manufactured outside of Arizona. *Id.* Agents also located approximately 40 rounds of Hornady .223 Rem ammunition (which is not compatible with an any of the recovered firearms), approximately 239 rounds of Federal 22LR ammunition, approximately 100 rounds of Winchester .45 Auto ammunition and approximately one round of Federal .45 Auto ammunition.

In a post-*Miranda* interview, Defendant stated the three firearms were gifts. Defendant stated that he had one .22 caliber rifle that was for coyotes. *Id.* He stated that when he moved to his house, he had problems with coyotes and a friend gave the rifle to him because it was dangerous, but he never had to use it. *Id.* Defendant stated that another firearm (the Colt Single Action) he was gifted for his birthday and the other one (the Colt 1911) was gifted to him approximately 2 years ago. Defendant discussed how expensive a .38 super is to purchase and that they run approximately 5,000 dollars. Defendant stated that he made tacos for a friend in Casa Grande and that he gifted him the .45 caliber in return. Defendant admitted he knew he was not allowed to have firearms. Defendant also admitted that he knew it was illegal to hire illegal aliens. (PSR ¶ 17). Defendant asserted he did not bring people from Mexico into the United States, but he hired people that were

already here. Defendant also indicated he told some of these people if they could come into the United States then he would give them a job at his business. (PSR ¶ 18).

However, some of the illegal aliens interviewed after the execution of the search warrants stated that Defendant *was* involved in their smuggling. (PSR ¶¶ 11-13). During an interview with one of the unlawful alien employees, this individual indicated he knew Defendant from their hometown in Mexico, and he communicated with him prior to leaving Guasave. (PSR ¶ 11). The alien informed Defendant he was being charged a $10,000 smuggling fee, and Defendant gave him $5,000 to pay part of the smuggling fee. *Id.*

During an interview of a former unlawful alien employee who was arrested at the 16th Avenue location, this individual also indicated he was from Guasave, and he knew Defendant from there. (PSR ¶ 12). He alleged Defendant paid for him to be smuggled from Mexico, and he needed to pay Defendant back. *Id.* This individual stated he owed Defendant $12,000 for being smuggled into the United States, and Defendant had told him someone would smuggle him from Mexico into the United States. *Id.* Additionally, Defendant was in contact with him while being smuggled. *Id.* This individual worked for Defendant for a year and a half to pay him back for his smuggling fee, and during this time he lived in a trailer on Defendant's property. *Id.* This person also identified four other individuals from Mexico that Defendant brought illegally into the United States and who were each required to pay him $12,000. *Id.*

Defendant's brother who was also an unlawful alien employee of the business was interviewed and stated he paid $10,000 to be smuggled into the United States, and he borrowed $5,000 from Defendant and a cousin. (PSR ¶ 13). This individual identified another employee who had asked Defendant to bring him to the United States from Mexico, and stated Defendant asked for people that were hard workers, responsible, and who did not have problems to become employees at Taco Loko. *Id.* Defendant made all the arrangements for the smuggling and paid the monies to the alien smuggler. *Id.* The unlawful aliens were then smuggled into the United States and in return paid Defendant

back all the money owed. *Id.* Most of them were from the same community in Guasave, and Defendant was in charge of contacting the human smuggler in Nogales, but the alien also had smuggler's phone number as well. *Id.*

HSI records and an examination of money flows from Defendant indicated he sent money to multiple subjects in Mexico. (PSR ¶ 19). His cellphone records also revealed numerous phone communications with a suspected alien smuggler. *Id.*

## III.    PSR CALCULATIONS

### A. Offense Level

The PSR correctly calculates Defendant's final post-departure guideline range on Count 1 as 30-37 months (using an adjusted offense level of 19 criminal history category I) as outlined below. [2]   The sentencing guidelines are not applicable to Count 4 as it is a conviction for a Class B misdemeanor.

| Guidelines | Offense Level |
| --- | --- |
| Base Offense Level (U.S.S.G. § 2K2.1(a)(4)(B)) | 20 |
| Three Firearms (U.S.S.G. § 2K2.1(b)(1)(A)) | +2 |
| Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a) and (b)) | -3 |
| Total Post-Departure Offense Level: 19, CH I<br>Total Post-Departure Range: **30-37 Months** | |

### B. Criminal History

Defendant has no criminal history convictions and is in criminal history category I. Defendant does have an arrest from April 14, 2021, for Possessing any Assault Weapon (PSR ¶ 39).  Defendant was stopped by San Bernardino County Sherriff's Department and admitted that there were firearms in the vehicle.  A subsequent search of the vehicle Defendant was driving revealed two assault weapons with 30 round magazines, four handguns, and ammunition.  Defendant stated the firearms belonged to a friend and that he was taking the firearms to his friend in Los Angeles.  On December 16, 2024, arrest relief was granted per California Penal Code § 851.93.

---

[2]    Defendant filed an objection to the PSR calculations (Doc. 25), and the government filed a response (Doc. 28).  As outlined in the government's response, it is the government's position that the PSR calculations are correct.

### C. Maximum Penalties and Plea Agreement

Count 1 is punishable by a maximum term of imprisonment of fifteen years and a maximum term of supervised release of three years. Count 4 is punishable by a maximum term of imprisonment of six months. The plea agreement provides that any term of imprisonment on Count 4 will run concurrently with Count 1. The government will move to dismiss Counts 2 and 3 of the Indictment at the time of sentencing.

## IV.    SENTENCING RECOMMENDATION

The United States respectfully requests that the Court vary downward and recommends that Defendant receive a sentence of 18 months' imprisonment on Count 1 and 6 months' imprisonment on Count 4 to be served concurrently followed by three years of supervised release. Defendant requests the Court vary downward to time-served, or approximately 112 days. (Doc. 30). This would be the equivalent of a ten-level downward variance. Although, the government agrees a downward variance is appropriate, the extent requested by Defendant is not for the below reasons.

The Court must impose a sentence "sufficient but not greater than necessary" in light of the following factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed —

   (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B)    to afford adequate deterrence to criminal conduct;

   (C)    to protect the public from further crimes of the defendant; and

   (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). Upon examining these factors, the government's recommended sentence is appropriate under the 3353(a) factors to reflect the seriousness of the offenses,

promote respect for the law, provide just punishment and afford adequate deterrence while still accounting for Defendant's particular history and characteristics.

In this case, the nature and circumstances of Defendant's offenses are serious, and his intentional conduct, even while knowing it was illegal, lasted years and was waiting for something like this to happen for a long time.  While the temptation to come to the United States in pursuit of economic opportunities is understandable, the manner in which Defendant did so is a crime. Once illegally present in the United States, Defendant was unlawfully employing unauthorized aliens and harboring some of them on his property[3]. Ultimately, Defendant's conduct led to the displacement of many illegal aliens he helped bring to live and work in this country illegally. Defendant knows the lawful way to enter, reside, work and live in the United States, as his wife possesses a work authorization card which permits her to lawfully work.  In stark contrast, Defendant does not; and neither did the dozen or more unauthorized aliens he hired and continued to employ.  So, he knew there was a lawful way, but chose not to do so.  Instead, he profited from the work of smuggled aliens. In addition, his possession of three firearms and 380 rounds of ammunition while being unlawfully present in the United States, for a second time[4], further demonstrates an unwillingness to follow the law.

Defendant's conduct led to the execution of federal search warrants at his property, the brick-and-mortar restaurant, the Taco Bus, the Taco Trailer, and a second residence located on 16th Avenue.  Defendant, his wife, and two children (ages 19 and 16) were present inside his residence during the search warrant. Other individuals were present throughout the property and surrounding trailers, including one illegal alien who attempted to flee.  Law enforcement followed standard protocol and procedures, including the carrying of firearms, to ensure the safety of the community and law enforcement officers

---

[3]       Defendant's memorandum conflates two crimes – human smuggling and human trafficking.  These are separate offenses with separate definitions. Human smuggling is primarily the bringing in, transporting, and harboring of illegal aliens in the United States. Human trafficking is generally the use of force, fraud, or coercion to obtain some type of labor.  This investigation did not involve human trafficking suspicions; it was human smuggling.

[4]       Defendant was previously arrested for possession firearms in California in 2021.

in the execution of the search warrants. Because the Defendant's property was barricaded with a secured and locked gate preventing law enforcement's entry, to safely approach the property law enforcement drove a law enforcement vehicle through the locked gate. During the search warrant, law enforcement located three firearms and 381 rounds of ammunition. No one was injured during the execution of the warrant.

The firearms are addressed more fully in the government's response to Defendant's objection to the PSR (Doc. 28). However, Defendant's objection to the PSR including an assertion that the firearms were for sporting use. In contract, in Defendant's sentencing memorandum (Doc. 30), Defendant states he never discharged the weapons which is consistent with the assertion that they were for sporting use only.

In mitigation, despite the possession of the firearms and ammunition, these were non-violent offenses. Defendant has family and community support. Many of the employees have spoken highly of his character and contribution to the community. Nonetheless, Defendant admitted employing unauthorized aliens was illegal, that he was waiting for this (meaning getting caught by law enforcement) for a long time, and he knew that he was not allowed to possess firearms. As a result, a custodial sentence longer than time-served (as requested by Defendant) is appropriate under the 3553(a) factors.

## V.    CONCLUSION

Based on the foregoing, the government respectfully submits that a sentence of 18 months on Count 1 and six months on Count 4 to be served concurrently, followed by three years of supervised release is sufficient but not greater than necessary to effectuate the factors set forth in Section 3553(a).

Respectfully submitted this 24th day of October, 2025.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

*s/ LeighAnn M. Thomas*
LEIGHANN M. THOMAS
Assistant U.S. Attorney

- 8 -

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th of October, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrant:

Ray Ybarra Maldonado
Nicholas A. Bustamante
*Attorneys for Defendant*

*s/ LeighAnn M. Thomas*